# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

R. LACEY COLLIGAN, M.D.,
plaintiff,

v.

MARY HITCHCOCK MEMORIAL HOSPITAL
and
DARTMOUTH HITCHCOCK CLINIC,
defendants.

Civil Action No.: _____

## COMPLAINT

### (Jury Trial Demanded)

1.      R. Lacey Colligan, M.D. ("Plaintiff" or "Dr. Colligan") complains against Mary Hitchcock Memorial Hospital and Dartmouth Hitchcock Clinic (collectively, "Defendants" or "Dartmouth-Hitchcock") for violations of the Rehabilitation Act (29 U.S.C. § 701 *et seq.*), the Americans with Disabilities Act (42 U.S.C. § 12101 *et seq.*), the Law Against Discrimination (R.S.A. 354-A:1 *et seq.*) and New Hampshire common law.

2.      Dr. Colligan was engaged by Dartmouth-Hitchcock as a research consultant pursuant to a contract between it and her company, Sharp End Advisory, LLC ("Sharp End"). Dr. Colligan was also a patient at Dartmouth-Hitchcock.  Dr. Colligan's medical history includes a diagnosis of post-traumatic stress disorder and depression.  Dartmouth-Hitchcock was aware of Dr. Colligan's condition before it terminated its relationship with her and her company because Dr. Colligan discussed her disability with representatives from Dartmouth-Hitchcock when she was retained and because she received treatment at Dartmouth-Hitchcock.

3.      On September 1, 2015, Dartmouth-Hitchcock unilaterally terminated its relationship with Dr. Colligan and her company because of her mental disabilities.  On the same

date and continuing to the date of the filing of this Complaint, Dartmouth-Hitchcock has denied

Dr. Colligan reasonable access to her healthcare providers and the Dartmouth-Hitchcock system

due to issues related to her mental disabilities. Dartmouth-Hitchcock's conduct has had the

effect of coercing, intimidating, threatening and interfering with the exercise and enjoyment of

Dr. Colligan's right to accommodation without discrimination and has caused Dr. Colligan to

suffer severe emotional distress with physical manifestations.

4.     Dr. Colligan seeks redress from this Court for Dartmouth-Hitchcock's intentional

and continuing discrimination against and conduct directed at a person with mental disabilities in

violation of federal and state law.

## PARTIES

5.     Dr. Colligan is an individual who resides at 8 Dana Road, Hanover, NH 03755.

6.     Mary Hitchcock Memorial Hospital is a New Hampshire non-profit corporation

with a principal office address of 1 Medical Center Drive, Lebanon, NH 03756.

7.     Dartmouth Hitchcock Clinic is a New Hampshire non-profit corporation with a

principal office address of 1 Medical Center Drive, Lebanon, NH 03756.

8.     Mary Hitchcock Memorial Hospital and Dartmouth Hitchcock Clinic operate

jointly under the trade name "Dartmouth-Hitchcock."

9.     Mary Hitchcock Memorial Hospital and Dartmouth Hitchcock Clinic are wholly

owned subsidiaries of Dartmouth Hitchcock Health, which, although not a party to this action at

this time, is a New Hampshire non-profit corporation with a principal office address of 1 Medical

Center Drive, Lebanon, NH 03756.

10.     Dartmouth-Hitchcock is a healthcare provider.

11.     Dartmouth-Hitchcock is a place of public accommodation.

12.     Dartmouth-Hitchcock employs more than 500 people.

13.     Dartmouth-Hitchcock receives federal funds.

## JURISDICTION, VENUE AND
## EXHAUSTION OF ADMINISTRATIVE PROCESS

14.     The jurisdiction of this Court is founded upon 28 U.S.C. § 1331 (Federal Subject

Matter Jurisdiction) and 28 U.S.C. § 1367 (Supplemental Jurisdiction).

15.     The Court has personal jurisdiction over each of the Defendants because they are

New Hampshire entities, conduct business in this District and engaged in unlawful conduct

and/or caused the harm at issue in this District.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

17.     On or about February 22, 2016, Dr. Colligan timely filed her discrimination

claims with the New Hampshire Commission for Human Rights, the United States Equal

Employment Opportunity Commission and the Office for Civil Rights at the Department of

Health and Human Services.

18.     Dr. Colligan filed this action more than 180 days after she filed her claims with

the New Hampshire Commission for Human Rights, the United States Equal Employment

Opportunity Commission and the Office for Civil Rights at the Department of Health and Human

Services, none of which made any rulings, and after providing the requisite notices of intent to

sue.

## FACTS

### Dr. Colligan's personal and professional background

19.     Dr. Colligan studied at Harvard Medical School and Columbia College of

Physicians and Surgeons, trained at Columbia Presbyterian, trained and worked at Dartmouth-

Hitchcock, boarded in Pediatrics, has a Master's Degree in Patient Safety, was awarded a

3

Fellowship to study Systems Engineering at the University of Virginia and is a peer-reviewed academic author in the areas of patient safety, health informatics and complexity science.

20.     Dr. Colligan is the founder and chief executive officer of Sharp End, which is a woman-owned business consulting organization.

21.     Dr. Colligan is also a mother.

22.     In 2012, Dr. Colligan's child died.

23.     Specifically, Dr. Colligan's twenty-one year old daughter experienced an unwitnessed cardiac arrest, was found by Dr. Colligan, underwent for almost one hour resuscitation started by Dr. Colligan and continued in her presence, had a definitive CT scan indicating she could not recover, yet received 30 hours of futile care against her mother's wishes.

24.     The experiences surrounding the loss of Dr. Colligan's child significantly impacted Dr. Colligan.

25.     Specifically, the experiences surrounding the loss of Dr. Colligan's child caused Dr. Colligan great anguish, mental disability and led to a diagnosis of post-traumatic stress disorder for which she sought and received treatment from healthcare providers.

26.     Among the healthcare providers that Dr. Colligan sought and received treatment from for her mental disabilities were healthcare providers at Dartmouth-Hitchcock.

<u>Dr. Colligan's relationship with the Dartmouth community</u>

27.     Prior to January 1, 2015, Dr. Colligan worked with Dartmouth-Hitchcock's Value Institute providing expertise in advanced safety science.

28.     Effective January 1, 2015, Dr. Colligan was appointed as an Adjunct Assistant Professor of the Department of Pediatrics at Geisel School of Medicine at Dartmouth College.

29.     Pursuant to a Research Services Agreement, Dartmouth-Hitchcock engaged Dr. Colligan through Sharp End as a consultant to conduct research related to methodologies to which Dr. Colligan brought specific expertise.

30.     Dr. Colligan was retained to conduct research on a project funded by the American Medical Association ("AMA").  Dartmouth-Hitchcock approached Dr. Colligan to work on the AMA project with Dartmouth-Hitchcock because while the project was important to Dartmouth-Hitchcock, it did not have the requisite in-house expertise.

31.     The AMA project was awarded to Dartmouth-Hitchcock, and not to a different institution in Cambridge, Massachusetts, because of its affiliation with Dr. Colligan who brought unique insight and skills to the work.

32.     The AMA project is the first rigorous research study of physician time spent on the Electronic Health Record ("EHR") and other administrative work in the current regulatory environment.  Results from four-hundred and thirty hours of direct observation validated physician and patient complaints about the burden of the EHR.

33.     The work associated with the AMA project was published in the Annals of Internal Medicine on September 6, 2016, and has received broad attention.

34.     Prior to September 1, 2015, employees of Dartmouth-Hitchcock, including but not limited to George Blike, M.D., were aware of Dr. Colligan's medical conditions.

35.     Dr. Blike is Dartmouth-Hitchcock's Chief Quality and Value Officer, is responsible for the quality, safety and value initiatives of the Dartmouth-Hitchcock system and is a member of Dartmouth-Hitchcock's Management Leadership Team.

36.     With regard to the allegations herein, Dr. Blike's conduct was within the scope of his employment at Dartmouth-Hitchcock.

37.     While negotiating her relationship with Dartmouth-Hitchcock, Dr. Colligan told Dartmouth-Hitchcock through Dr. Blike about her child's death and her reaction to it, which has included diagnosed mental disabilities and post-traumatic stress disorder.

38.     As a result, certain contractual provisions affecting Dr. Colligan's relationship with Dartmouth-Hitchcock were considered, although ultimately not approved, by Dartmouth-Hitchcock in order to accommodate Dr. Colligan's mental disabilities.

39.     At or around this time, Dr. Colligan was also one of three significant contributors to an Agency for Healthcare Research and Quality ("AHRQ") grant.  AHRQ is an agency within the United States Department of Health and Human Services.  The AHRQ grant was awarded to Dartmouth-Hitchcock.  John Birkmeyer, M.D., was its Program Director/Principle Investigator.

40.     On April 24, 2015, Dr. Birkmeyer submitted Dartmouth-Hitchcock's grant proposal -- Failure to Rescue: Patient Safety Learning Laboratory -- for consideration by AHRQ.

41.     Dartmouth-Hitchcock's proposal was successful, and the AHRQ grant was funded for four years in the approximate amount of $3.9 million.

42.     Dr. Colligan's intellectual contributions to the AHRQ grant were based on her unique expertise in advanced safety science methodologies.

43.     The AHRQ research was important to Dr. Colligan because the experiences surrounding the loss of her child inspired her dedication to this advanced safety work.

44.     The AHRQ research was to have sustained Dr. Colligan's work advancing these safety methodologies.

<u>Dr. Birkmeyer</u>

45.     At all relevant times, Dr. Birkmeyer was one of three Executive Vice Presidents of Dartmouth-Hitchcock.

46.     With regard to the allegations herein, Dr. Birkmeyer's conduct was within the scope of his employment at Dartmouth-Hitchcock.

47.     Dr. Birkmeyer's responsibilities included working with the Chief Operating Officer (Dan Jantzen) to oversee and direct all operations throughout Dartmouth-Hitchcock.

48.     Dr. Birkmeyer was also Dartmouth-Hitchcock's Chief Academic Officer, and as part of Dartmouth-Hitchcock's Management Leadership Team, he worked closely with the Geisel School of Medicine at Dartmouth College, collaborating on academic and research initiatives between the medical school and the academic medical center.

49.     Dr. Birkmeyer's tenure as Executive Vice President of Dartmouth-Hitchcock was short lived and contentious.

50.     On or around July 22, 2014, Dartmouth-Hitchcock announced that Dr. Birkmeyer had been hired as its Executive Vice President of Dartmouth-Hitchcock.

51.     On or around October 4, 2016, Dartmouth-Hitchcock announced that Dr. Birkmeyer would resign as its Executive Vice President effective October 14, 2016.

<u>Dr. Colligan and Dr. Birkmeyer are neighbors</u>

52.     Dr. Colligan and Dr. Birkmeyer live within a block and a half of one another.

53.     Prior to September 1, 2015, Dr. Colligan knew Dr. Birkmeyer because they were collaborators on the AHRQ grant, attended a meeting together to discuss the AHRQ grant and because he gave "Town Hall" meetings to introduce himself as Dartmouth-Hitchcock's Executive Vice President as well as his management plan.

54.     Prior to September 1, 2015, Dr. Birkmeyer knew Dr. Colligan because he was the principal investigator of the AHRQ grant received by Dartmouth-Hitchcock, and Dr. Colligan was one of three significant contributors to the AHRQ grant.

55.     Dr. Colligan knows where Dr. Birkmeyer lives because they are neighbors.

September 1, 2015

56.     Around 8:00 a.m. on Tuesday, September 1, 2015, Dr. Colligan went to visit an elderly friend who lives on the same street as the Birkmeyers.

57.     Before stopping at her friend's home, Dr. Colligan perceived someone was parked in a car across the street from the Birkmeyers and was taking pictures with a long-lens camera.

58.     As Dr. Colligan passed by that car, she believed that she recognized the person inside it as someone who had recently been terminated by Dartmouth-Hitchcock and may have had a reason to be upset with Dr. Birkmeyer.

59.     Among the consequences of Dr. Colligan's mental disability and post-traumatic stress disorder are her hypervigilance to perceived dangers and her reaction of trying to warn and protect others from those perceived dangers.

60.     Upon perceiving danger in the form of a person parked across the street from the Birkmeyer home, Dr. Colligan became concerned for the Birkmeyers' safety.

61.     The degree of the perceived danger was exacerbated by Dr. Colligan's post-traumatic stress disorder and mental disability.

62.     As a consequence of seeing what she perceived to be a threat to the home of her neighbor and colleague, Dr. Colligan reacted by trying to warn and protect the Birkmeyers.

63.     Dr. Colligan drove past the Birkmeyer home, parked and walked up the driveway towards an open side door with many construction workers filing in and out.

64.     Dr. Colligan stopped at the threshold and asked if Dr. Birkmeyer was home.

65.     A construction worker referred Dr. Colligan to the front door.

66.     Dr. Colligan proceeded to the front door intending to warn the Birkmeyers about the suspicious activity she had perceived.

67.     By the time Dr. Colligan reached the front door, the car across the street had left, and thus Dr. Colligan was no longer able to point at the car to explain what she had perceived.

68.     Dr. Colligan was uncomfortable about naming the person she saw in the car out of concern that she may have been mistaken about identity.

69.     Mrs. Birkmeyer greeted Dr. Colligan at the front door.

70.     While trying to explain to Mrs. Birkmeyer the danger she perceived, Dr. Colligan became flustered, which is a symptom of her post-traumatic stress disorder and mental disability.

71.     Dr. Colligan was immediately embarrassed by the encounter with Mrs. Birkmeyer so she went to buy flowers and a note card for use as a gesture of apology.

72.     Half an hour later, Dr. Colligan left the flowers and an apology note on the front step of the Birkmeyer's home.

### Dr. Birkmeyer's overreaction

73.     Mrs. Birkmeyer reported Dr. Colligan's visit to her husband, Dr. Birkmeyer.

74.     Dr. Birkmeyer reported Dr. Colligan's presence at his home to Dartmouth-Hitchcock.

75.     Knowing that Dr. Colligan was suffering from mental disabilities, yet without speaking to Dr. Colligan before making a decision, Dartmouth-Hitchcock decided to terminate its relationship with Dr. Colligan within a few hours of the encounter at the Birkmeyer's home.

### Dr. Birkmeyer's call to the police

76.     Dr. Birkmeyer also reported Dr. Colligan to the police.

77.     Hanover Police Officer Michael Alterisio reported that he spoke to Dr. Birkmeyer at 2:18 p.m. on September 1, 2015.

78.     Attached hereto as **Exhibit A** and incorporated herein is a copy of Officer Alterisio's police report.

79.     Dr. Birkmeyer told the police that he is the Executive Vice President of Dartmouth-Hitchcock.

80.     Dr. Birkmeyer told the Police that he did not know Dr. Colligan.

81.     Dr. Birkmeyer told the Police that Dartmouth-Hitchcock knew about the encounter at his home.

82.     Dr. Birkmeyer told the police that Dr. Colligan has been having psychological issues lately due to an unknown issue.

83.     Dr. Birkmeyer told the police that Dartmouth-Hitchcock had already made the decision to terminate its relationship with Dr. Colligan.

84.     The police report states that Dr. Birkmeyer told Officer Alterisio that Dr. Colligan "was let go of her position with DHMC today."

85.     According to Dr. Birkmeyer, Dartmouth-Hitchcock's decision to terminate its relationship with Dr. Colligan occurred before anyone from Dartmouth-Hitchcock spoke to Dr. Colligan about her visit to the Birkmeyers' home.

86.     The police report states in relevant part:

> Mr. Birkmeyer stated that DHMC Risk Management knows about the situation and wanted the police department to be aware of it as well.  He stated that Ms. Colligan was an employee of DHMC through a third party employer and has been having psychological issues lately due to an unknown issue.  […]  Mr. Birkmeyer is the Executive Vice President of DHMC.  He stated that he does not know Mrs. Colligan but that she has been working on a project for DHMC recently.  He also informed me that she was let go of her position with DHMC today.

10

87.     After Dr. Birkmeyer disclosed to the police Dartmouth-Hitchcock's knowledge of Dr. Colligan's mental disabilities and its decision to terminate its relationship with her, Officer Alterisio followed up with Dartmouth-Hitchcock Security and Risk Management, who told him that "[t]hey could not provide any information on Mrs. Colligan when asked about her mental status."

Dr. Colligan's termination

88.     Later in the day, on September 1, 2015, after Dr. Birkmeyer had reported to the police that Dartmouth-Hitchcock decided to terminate Dr. Colligan, Attorney Karen Aframe, Director of Employee Relations at Dartmouth-Hitchcock, held a phone conference with Dr. Colligan and Dr. Blike to advise Dr. Colligan of Dartmouth-Hitchcock's determination to terminate its relationship with her, which had already been made.

89.     With regard to the allegations herein, Attorney Aframe's conduct was within the scope of her employment at Dartmouth-Hitchcock.

90.     On September 1, 2015, Attorney Aframe first spoke to Dr. Colligan after Dr. Birkmeyer reported Dr. Colligan to the police.

91.     Attorney Aframe asked Dr. Colligan three "yes" or "no" questions, and then told Dr. Colligan that she was terminated.

92.     During this meeting, Attorney Aframe did not tell Dr. Colligan that Mrs. Birkmeyer or Dr. Birkmeyer felt threatened by Dr. Colligan's conduct and did not provide Dr. Colligan with an opportunity to explain her actions.

93.     Within minutes of informing Dr. Colligan that she had been terminated, Attorney Aframe e-mailed Dr. Colligan.

94.     Attorney Aframe's e-mail encouraged Dr. Colligan to call the New Hampshire Professional Health Program, which is a mental health resource for healthcare professionals.

95.     Attached hereto as **Exhibit B** and incorporated herein is a copy of the e-mail from Attorney Aframe to Dr. Colligan dated September 1, 2015 at 4:21 p.m.

96.     On September 2, 2016, Attorney Aframe sent Dr. Colligan a letter terminating both Dr. Colligan and her company's relationship with Dartmouth-Hitchcock.

97.     Attached hereto as **Exhibit C** and incorporated herein is a copy of the letter dated September 2, 2015 from Attorney Aframe to Dr. Colligan.

98.     Attorney Aframe's letter also imposes limitations on Dr. Colligan's access to and use of the Dartmouth-Hitchcock system.

99.     Attorney Aframe's letter of September 2, 2015 states, *inter alia*, "[b]ased on the fact that your actions have raised concern for our staff's personal safety, you are not to come onto any Dartmouth-Hitchcock property, with exceptions to this restriction for 1) a genuine medical emergency that you or a family member may experience involving the need for immediate medical attention at Dartmouth-Hitchcock, and 2) to the extent you are a patient of a Dartmouth-Hitchcock provider, scheduled appointments with your provider at Dartmouth-Hitchcock, provided that you contact Security prior to arriving for any such appointment."

100.    Prior to terminating Dr. Colligan, Dartmouth-Hitchcock did not determine whether Dr. Colligan posed an actual threat to the health or safety of herself or others in the workplace that could not be eliminated or reduced by reasonable accommodation.

101.    Such determinations must be made on an individual basis after assessing an individual's ability to safely perform the essential functions of the job.

102.    Moreover, such determinations must be based on a reasonable medical judgment that relies on the most current medical knowledge and the best available objective information.

103.    Such decisions cannot be based on the kind of speculative or stereotypical thinking about mental disabilities that Dartmouth-Hitchcock exhibited.

104.    Dartmouth-Hitchcock's decision to terminate its relationship with Dr. Colligan, terminate her work on the AMA project and the AHRQ grant and limit her access to its system constitutes discriminatory conduct against a person who was known to be suffering from a mental disability.

<u>The consequences of Dartmouth-Hitchcock's discriminatory conduct</u>

105.    When Dartmouth-Hitchcock terminated Dr. Colligan, it also denied Dr. Colligan access to her Dartmouth-Hitchcock email account.  A significant amount of Dr. Colligan's research on the AMA project was stored in those emails.

106.    In the aftermath of the termination, Dartmouth-Hitchcock denied Dr. Colligan's requests to access her emails so that she could finish work on the AMA project.

107.    In fact, Dartmouth-Hitchcock attempted to effectively remove Dr. Colligan from the AMA project by refusing her access to her emails and suggesting to the AMA that it could complete the project without her.

108.    Dartmouth-Hitchcock demanded that Dr. Colligan's name never be associated with any of the AMA work or subsequent publications despite the fact that she was the lead researcher on the project.  Ultimately, the AMA designated Dr. Colligan as the second author, behind its own employee and above Dr. Blike who was the ninth author, of the AMA project.

109.    Dartmouth-Hitchcock soon discovered it had no agent to employ other than Dr. Colligan who was competent to interpret the data and finalize the project.

110.    Dartmouth-Hitchcock found itself between a rock and a hard place.

111.    After Dartmouth-Hitchcock terminated Dr. Colligan, it began seeking information from Dr. Colligan about her work on the AMA project.

112.    Dartmouth-Hitchcock determined it needed Dr. Colligan's expertise for the AMA project despite the fact that it had terminated its relationship with her.

113.    In the discussions that followed, Dr. Colligan's counsel offered to explain the reason for Dr. Colligan's visit to the Birkmeyer's home.

114.    Attached hereto as **Exhibit D** and incorporated herein is a copy of a letter dated September 17, 2015 from Shaheen & Gordon, P.A. to Dartmouth-Hitchcock.

115.    Dartmouth-Hitchcock's counsel was unwilling to listen to any explanation and stated that Dartmouth-Hitchcock did not wish to leave the impression that anything Dr. Colligan could say would result in her reinstatement.

116.    This refusal to even listen to Dr. Colligan's explanation provided Dartmouth-Hitchcock with a convenient means of maintaining its façade of ignorance while using the prohibition on access to its facilities as leverage in its work dispute with Dr. Colligan.

 Dartmouth-Hitchcock's escalating discriminatory conduct against Dr. Colligan as a professional

117.    Keith Loud, M.D., is Chair of Pediatrics at Dartmouth-Hitchcock and Associate Professor of Pediatrics at Dartmouth's Geisel School of Medicine.

118.    With regard to the allegations herein, Dr. Loud's conduct was within the scope of his employment at Dartmouth-Hitchcock.

119.    On September 23, 2015, Dr. Loud sent an email to Dr. Colligan stating: "I have been notified that you are no longer allowed on the DHMC campus other than emergency care

for yourself or family members.  We will therefore not have you presenting to our Faculty as we had previously communicated."

120.    Attached hereto as **Exhibit E** and incorporated herein is a copy of the email dated September 23, 2015 from Dr. Loud to Dr. Colligan.

121.    Dr. Loud's e-mail placed greater restrictions on Dr. Colligan's ability to access Dartmouth-Hitchcock than those set forth in Attorney Aframe's letter of September 2, 2015.

122.    Dr. Loud's email also foreclosed Dr. Colligan's ability to participate as a faculty member at Geisel School of Medicine.

123.    On October 19, 2015, Dr. Colligan received official notice that her participation in the faculty of Geisel at Dartmouth College ended on and was backdated to October 1, 2015.

124.    There was no written explanation of why Dr. Colligan's faculty participation was terminated.

125.    Dr. Colligan's faculty appointment letter did not include a requirement that she work with Dartmouth-Hitchcock.

126.    Dr. Colligan was informed by Geisel staff that she had been terminated because of her relationship with Dartmouth-Hitchcock.

Dartmouth-Hitchcock's escalating discriminatory conduct against Dr. Colligan as a patient

127.    On September 29, 2015, with the dispute over the AMA work ongoing, Dartmouth-Hitchcock's discriminatory behavior against Dr. Colligan escalated.

128.    When Dr. Colligan made her mandated call to Dartmouth-Hitchcock security to tell them she was attending an appointment that day, security representatives informed her that she had to report to the security desk in the main lobby for an escort to her appointment.

129.    With regard to the allegations herein, all security representatives' conduct was within the scope of their employment at Dartmouth-Hitchcock.

130.    Dr. Colligan had been to her mental health provider at Dartmouth-Hitchcock several times since September 1, 2015, without incident, after giving telephone notification to security.

131.    An escort had never been required for other appointments and this was an obvious change from the previous arrangements.

132.    When she presented at security for her appointment, Dr. Colligan was subjected to the distress of having to stand in the hallway while her colleagues passed by and security members loudly asked her to state her name and to declare the purpose of her medical visit.

133.    Because it was an appointment with her mental health provider, Dr. Colligan was humiliated by being delayed and having to disclose that fact in a very public setting.

134.    As Dr. Colligan broke into tears she could hear the security representatives saying "she's had problems before."

135.    Dr. Colligan fell to the floor of the lobby crying, became frozen in fear and was taken to the emergency room against her will.

136.    Being frozen in fear is a symptom of post-traumatic stress disorder.

137.    In the emergency room, Dr. Colligan's name and a description of her condition was announced loudly such that other patients and staff could easily hear.

138.    Dr. Colligan was further humiliated because she had previously worked in this emergency room, and was known to the staff on a professional and personal basis.

139.    Dr. Colligan never reached her scheduled appointment on September 29, 2015.

140.    On October 7, 2015, and again on October 19, 2015, Dr. Colligan, through

counsel, recited these and other facts in correspondence to Dartmouth-Hitchcock.

141.    Attached hereto as **Exhibits F & G** and incorporated herein are copies of the

letters dated October 7, 2015 and October 19, 2015 from Shaheen & Gordon, P.A. to Dartmouth-

Hitchcock.

142.    Following the incident on September 29, 2015, Dr. Colligan was so traumatized

that she was unable to return to the campus to see her mental health provider.

143.    This subsequently resulted in her experiencing a severe mental health crisis

requiring several inpatient hospitalizations.

144.    Also as a result of Dartmouth-Hitchcock's refusal to provide reasonable access to

the campus for purposes of medical care and the trauma suffered by Dr. Colligan during the

September 29, 2015 incident, Dr. Colligan was forced to change to another mental health

provider not affiliated with Dartmouth-Hitchcock.

145.    Because her insurance centered on the Dartmouth-Hitchcock system, sometimes

referred to as "narrow network" coverage, Dr. Colligan was forced to seek care from an out-of-

network provider at her own expense.

146.    Through counsel, Dr. Colligan made several attempts to resolve the

aforementioned issues with Dartmouth-Hitchcock.

147.    Dr. Colligan, among other things, sought to obtain access to Dartmouth-

Hitchcock for professional, personal and medical reasons, all of which were limited by

Dartmouth-Hitchcock including her ability to visit any friends or relatives in the hospital, enjoy

her academic community, see her colleagues, attend continuing medical education conferences,

attend community health programs or even use the library.

148.     Dr. Colligan pursued the avenues of recourse outlined in her Geisel School of Medicine faculty appointment letter.  Despite following specific procedures for raising issues with Dartmouth-Hitchcock supervisors, Dartmouth College and Geisel School of Medicine representatives referred her back to Dartmouth-Hitchcock.

149.     Dartmouth-Hitchcock has refused to alter its behavior and has rejected all attempts to address the facts described herein.

150.     On December 7, 2015, Dartmouth-Hitchcock's Office of General Counsel responded to Dr. Colligan's requests.

151.     Attached hereto as **Exhibit H** and incorporated herein is a copy of a letter dated December 7, 2015 from Dartmouth-Hitchcock.

152.     Despite the "Culture of Caring" that is emblazoned on its letterhead, Dartmouth-Hitchcock wrote "[w]e are very sorry to hear that Dr. Lacey Colligan suffers from a PTSD-related disability" right before claiming that "none of the individuals involved in the decision to part ways with Dr. Colligan were aware that she suffered from a disability."

153.     The statement "none of the individuals involved in the decision to part ways with Dr. Colligan were aware that she suffered from a disability" is false.

154.     This December 7, 2015 letter does not explain how Dr. Birkmeyer learned about Dr. Colligan's mental disability.

155.     This December 7, 2015 letter does not explain why Dr. Colligan's mental disability was disclosed to the police.

156.     This December 7, 2015 letter does not explain why Dartmouth-Hitchcock Security and Risk Management knew about Dr. Colligan's mental status.

157.    This December 7, 2015 letter does not explain why Attorney Aframe referred Dr. Colligan to the New Hampshire Professional Health Program.

<u>Dartmouth-Hitchcock's continuing discriminatory conduct</u>

158.    Even after acknowledging Dr. Colligan's disability in its letter of December 7, 2015, Dartmouth-Hitchcock has maintained its ban on Dr. Colligan's access to Dartmouth-Hitchcock and its providers and has continued its efforts to intimidate Dr. Colligan and interfere with her rights.

159.    On February 22, 2016, Dr. Colligan filed discrimination complaints with the New Hampshire Commission for Human Rights, the United States Equal Employment Opportunity Commission and the Office for Civil Rights at the Department of Health and Human Services. Dr. Colligan provided written notice of these complaints to Dartmouth-Hitchcock in correspondence dated February 22, 2016.

160.    As a part of the treatment that Dr. Colligan requires as a consequence of Dartmouth-Hitchcock's conduct, Dr. Colligan intended to attend group support meetings at Dartmouth-Hitchcock's "Aging Resource Center."

161.    On March 15, 2016, Dr. Colligan called a representative of Dartmouth-Hitchcock's security to inquire if the Aging Resource Center qualified as its campus.

162.    The security representative required Dr. Colligan to identify herself before he would answer the question.

163.    After Dr. Colligan identified herself, the representative said: "You cannot go to any of our facilities.  We have employees there."

164.    Dr. Colligan asked if she could call ahead and let Dartmouth-Hitchcock know that she has a meeting to attend.

165.    The representative answered: "No.  You cannot go there at all."

166.    Dr. Colligan then asked if she could attend the meeting with an escort.

167.    The representative responded: "No.  You cannot enter that building at all.  You can check with my supervisor, but that's what they'll say."

168.    Dartmouth-Hitchcock's conduct has caused post-traumatic stress and depression associated with Dr. Colligan's prior diagnoses to be exacerbated.

169.    Dartmouth-Hitchcock's conduct has caused Dr. Colligan to suffer from major depressive disorder.

170.    As a result of Dartmouth-Hitchcock's conduct, Dr. Colligan has been hospitalized on several occasions and is presently unable to work.

**COUNT I**
**Violation of 29 U.S.C. § 794**
**(Nondiscrimination Under Federal Grants and Programs)**

171.    Dr. Colligan incorporates all paragraphs herein as if fully restated.

172.    29 U.S.C. § 794 states: "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service."

173.    By the facts alleged herein, Dartmouth-Hitchcock is receiving federal financial assistance in programs and/or activities including those related to the AHRQ grant.

174.    By the facts alleged herein, Dr. Colligan is a qualified individual with a disability, as well as an owner of a woman-owned company, who has been excluded from participation in,

denied the benefits of, and subjected to discrimination by Dartmouth-Hitchcock including with respect to the AHRQ grant.

175.   Dr. Colligan claims all damages that she is entitled to under this cause of action as a consequence of Dartmouth-Hitchcock's conduct.

## COUNT II
### Violation of 42 U.S.C. § 12182
### (Federal public accommodation discrimination)

176.   Dr. Colligan incorporates all paragraphs herein as if fully restated.

177.   42 U.S.C. § 12182(a) states: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."

178.   By the facts alleged herein, Dartmouth-Hitchcock's system, facilities, campus and locations are places of public accommodation.

179.   By the facts alleged herein, Dr. Colligan is an individual with a disability.

180.   By the facts alleged herein, Dartmouth-Hitchcock discriminated against Dr. Colligan on the basis of her mental disability in the full and equal enjoyment of its services, facilities, privileges, advantages and/or accommodations.

181.   Dr. Colligan claims all damages and injunctive relief that she is entitled to under this cause of action as a consequence of Dartmouth-Hitchcock's conduct.

## COUNT III
### Violation of R.S.A. 354-A:17
### (State public accommodation discrimination)

182.   Dr. Colligan incorporates all paragraphs herein as if fully restated.

183.     R.S.A. 354-A:17 states: "It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, because of the age, sex, race, creed, color, marital status, physical or mental disability or national origin of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof; or, directly or indirectly, to publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement to the effect that any of the accommodations, advantages, facilities and privileges of any such place shall be refused, withheld from or denied to any person on account of age, sex, race, creed, color, marital status, physical or mental disability or national origin; or that the patronage or custom there at of any person belonging to or purporting to be of any particular age, sex, race, creed, color, marital status, physical or mental disability or national origin is unwelcome, objectionable or acceptable, desired or solicited."

184.     By the facts alleged herein, Dartmouth-Hitchcock's system, campus and locations are places of public accommodation.

185.     By the facts alleged herein, Dr. Colligan is a person with a mental disability.

186.     By the facts alleged herein, Dartmouth-Hitchcock discriminated against Dr. Colligan on the basis of her mental disability in the full and equal enjoyment of the accommodations, advantages, facilities and/or privileges of its facilities.

187.     By the facts alleged herein, Dartmouth-Hitchcock has directly or indirectly published, circulated, issued, displayed, posted and/or mailed written or printed communications, notices or advertisements to the effect that its accommodations, advantages, facilities and

privileges have been refused, withheld from or denied to Dr. Colligan on account of her mental disability.

188.    Dr. Colligan claims all damages and injunctive relief that she is entitled to under this cause of action as a consequence of Dartmouth-Hitchcock's conduct.

## COUNT IV
## Violation of 42 U.S.C. § 12203(b)
## (Federal interference, coercion and intimidation)

189.    Dr. Colligan incorporates all paragraphs herein as if fully restated.

190.    42 U.S.C. § 12203(b) states: "It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter."

191.    By the facts alleged herein, Dartmouth-Hitchcock has coerced, intimidated, threatened and/or interfered with Dr. Colligan's right to access its places of public accommodation without discrimination by leveraging her termination and healthcare needs for its own benefit.

192.    Without limitation to the foregoing allegations incorporated herein, by March 1, 2016 Dartmouth-Hitchcock had received Dr. Colligan's Verified Complaint to the New Hampshire Commission for Human Rights Charging Employment Discrimination, Public Accommodation Discrimination and Interference, Coercion and Intimidation, and yet on March 15, 2016, Dartmouth-Hitchcock continued its interference with, and coercion and intimidation of, Dr. Colligan's exercise of her rights by discriminatorily denying her access to its facilities.

193.    Dr. Colligan claims all damages that she is entitled to under this cause of action as a consequence of Dartmouth-Hitchcock's conduct.

**COUNT V**
**Violation of R.S.A. 354-A:11**
**(State interference, coercion and intimidation)**

194.    Dr. Colligan incorporates all paragraphs herein as if fully restated.

195.    R.S.A. 354-A:11 states: "It shall be an unlawful discriminatory act to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this chapter."

196.    By the facts alleged herein, Dartmouth-Hitchcock has coerced, intimidated, threatened and/or interfered with Dr. Colligan's right to access its places of public accommodation without discrimination by leveraging her termination and healthcare needs for its own benefit.

197.    Without limitation to the foregoing allegations incorporated herein, by March 1, 2016 Dartmouth-Hitchcock had received Dr. Colligan's Verified Complaint to the New Hampshire Commission for Human Rights Charging Employment Discrimination, Public Accommodation Discrimination and Interference, Coercion and Intimidation, and yet on March 15, 2016, Dartmouth-Hitchcock continued its interference with, and coercion and intimidation of, Dr. Colligan's exercise of her rights by discriminatorily denying her access to its facilities.

198.    Dr. Colligan claims all damages that she is entitled to under this cause of action as a consequence of Dartmouth-Hitchcock's conduct.

**COUNT VI**
**Intentional Infliction of Emotional Distress**

199.    Dr. Colligan incorporates all paragraphs herein as if fully restated.

200.    By the facts alleged herein, Dartmouth-Hitchcock's intentional or reckless conduct was extreme and outrageous and caused severe emotional distress to Dr. Colligan.

201.    Without limitation to the foregoing allegations incorporated herein, Dartmouth-Hitchcock: knew that Dr. Colligan suffered from mental disabilities relating to her daughter's death; unlawfully terminated Dr. Colligan's relationship with Dartmouth-Hitchcock because of those mental disabilities; leveraged Dr. Colligan's relationship with Dartmouth-Hitchcock and/or mental disability for its own benefit; publicly disclosed to the police and anyone in earshot of its facilities and privately disclosed to many of its employees that Dr. Colligan suffers from mental disabilities; and interfered with Dr. Colligan's relationship with the AHRQ grant and AMA project as a result of its discriminatory practices; all of which was intentional or reckless conduct.

202.    As a consequence of Dartmouth-Hitchcock's intentional or reckless conduct, Dr. Colligan suffered and continues to suffer severe emotional distress necessitating outpatient and inpatient mental health care and has been prevented from being employed.

203.    Dartmouth-Hitchcock's conduct before and after its false statement that "none of the individuals involved in the decision to part ways with Dr. Colligan were aware that she suffered from a disability" has been beyond all bounds of decency and utterly intolerable in a civilized community.  For instance, long after Dartmouth-Hitchcock knew that Dr. Colligan suffered from mental disabilities relating to her daughter's death, it continued its practice of denying Dr. Colligan access to its facilities, which are places of public accommodation.

204.    Dr. Colligan claims all damages that she is entitled to under this cause of action as a consequence of Dartmouth-Hitchcock's conduct.

## COUNT VII
### Negligent Infliction of Emotional Distress

205.    Dr. Colligan incorporates all paragraphs herein as if fully restated.

206.    By the facts alleged herein, Dartmouth-Hitchcock negligently and foreseeably caused serious mental and emotional harm accompanied by objective physical symptoms to Dr. Colligan.  Specifically, at all relevant times, Dartmouth-Hitchcock knew, should have known and/or intentionally avoided knowing that Dr. Colligan suffered from mental disabilities and that its conduct in relation to her mental disabilities had caused, was causing and would cause Dr. Colligan to suffer serious mental and emotional harm accompanied by objective physical symptoms.

207.    As a consequence of Dartmouth-Hitchcock's negligent conduct, Dr. Colligan suffered and continues to suffer severe emotional distress necessitating outpatient and inpatient mental health care and has been prevented from being employed.

208.    Dr. Colligan claims all damages that she is entitled to under this cause of action as a consequence of Dartmouth-Hitchcock's conduct.

## COUNT VIII
### Attorney's Fees and Litigation Costs
### (Pursuant to 29 U.S.C. § 794a, 42 U.S.C. § 12205, state and common law)

209.    Dr. Colligan incorporates all paragraphs herein as if fully restated.

210.    By the facts alleged herein and the claims resulting therefrom, Dr. Colligan is entitled to recover from Dartmouth-Hitchcock her reasonable attorney's fees and litigation costs.

## COUNT IX
### Enhanced Compensatory Damages

211.    Dr. Colligan incorporates all paragraphs herein as if fully restated.

212.    Dr. Colligan is entitled to enhanced compensatory damages as a consequence of Dartmouth-Hitchcock's wanton, malicious, oppressive and aggravating conduct alleged herein.

## PRAYERS FOR RELIEF

213.    WHEREFORE, Dr. Colligan respectfully requests that the Court:

26

A. Enter judgment on all Counts;

B. Enter injunctive relief allowing Dr. Colligan access to Dartmouth-Hitchcock's

   places of public accommodation;

C. Award Dr. Colligan all damages to which she is entitled;

D. Award Dr. Colligan her reasonable attorney's fees and litigation costs; and

E. Grant such further relief as is necessary and proper.

 

                                 Respectfully submitted,

                                 R. LACEY COLLIGAN,

                                 By her attorneys,

                                 SHAHEEN & GORDON, P.A.,

November 18, 2016             /s/ William E. Christie

                                 William E. Christie (NH bar # 11255)
                                 Timothy J. McLaughlin (NH bar # 19570)
                                 107 Storrs Street
                                 P.O. Box 2703
                                 Concord, NH 03302
                                 (603) 617-3035
                                 bchristie@shaheengordon.com
                                 tjmclaughlin@shaheengordon.com