UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

R. Lacey Colligan

     v.                         Civil No. 16-cv-513-JD
                                          Opinion No. 2018 DNH 254

Mary Hitchcock Memorial
Hospital, et al.

ORDER

R. Lacey Colligan brought suit against Mary Hitchcock
Memorial Hospital and Dartmouth Hitchcock Clinic ("Dartmouth-
Hitchcock"), alleging discrimination based on her disability,
post-traumatic stress disorder, and state law claims for
negligent and intentional infliction of emotional distress,
defamation, and invasion of privacy.  Dartmouth-Hitchcock moves
for summary judgment.  Colligan objects.

Standard of Review

Summary judgment is appropriate when the moving party
"shows that there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).  "A genuine issue of material fact only
exists if a reasonable factfinder . . . could resolve the
dispute in that party's favor."  Town of Westport v. Monsanto
Co., 877 F.3d 58, 64-65 (1st Cir. 2017) (internal quotation
marks omitted).  The court must take the facts and draw all

reasonable inferences in the light most favorable to the nonmoving party. McGunigle v. City of Quincy, 835 F.3d 192, 202 (1st Cir. 2016). However, "[a]n inquiring court is not obliged either 'to draw unreasonable inferences or credit bald assertions [or] empty conclusions.'" Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018) (quoting Cabán Hernández v. Phillip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2017)).

Background

Colligan, a medical doctor specializing in pediatric medicine, began suffering from PTSD after her daughter died unexpectedly in 2012. Soon afterward, Colligan ended her practice of clinical medicine and formed a limited liability company, Sharp End Advisory.

In 2014, Colligan and her husband, John Colligan, moved to Hanover, New Hampshire, where Colligan began working for Dartmouth-Hitchcock through a contract with Sharp End Advisory. The American Medical Association awarded Dartmouth-Hitchcock funding to conduct a study, and Dr. George Blike, a department head at Dartmouth-Hitchcock, hired Colligan to head the team conducting the study. In addition, Colligan assisted Dartmouth-Hitchcock in obtaining a $3.9 million federal grant.

Although Dartmouth-Hitchcock and Blike would have preferred to hire Colligan as an employee, Colligan preferred to work as an independent contractor through Sharp End Advisory.[1]  While discussing the possibility and nature of her employment with Dartmouth-Hitchcock, Colligan told Blike that she had PTSD as a result of her daughter's death.

Around the same time that it hired Colligan as an independent contractor, Dartmouth-Hitchcock's executive vice president, Dr. John Birkmeyer, became the face of a restructuring program that required layoffs.  Because of these layoffs, Birkmeyer grew unpopular among Dartmouth-Hitchcock's staff.  Birkmeyer held "town hall meetings" with Dartmouth-Hitchcock staff about the restructuring that were often contentious.  Although she was not subject to Dartmouth-Hitchcock's restructuring and layoffs, Colligan understood that Birkmeyer was unpopular among the hospital's staff.

On September 1, 2015, while driving to work, Colligan passed Birkmeyer's home, which was close to her own.  In her deposition, Colligan testified that she saw a "Suburban-like" SUV parked across from Birkmeyer's house, with a man sitting inside taking photographs of the house.  Colligan later

_____

[1] For ease of reference, the court refers to Colligan as having an employment relationship with Dartmouth-Hitchcock although she was an independent contractor.

identified the man as a disgruntled physician whom Birkmeyer had
fired.

Concerned by the presence of the SUV and the man taking
photographs, Colligan parked her car nearby and went to
Birkmeyer's front door.  Nancy Birkmeyer, John Birkmeyer's wife,
answered.  Colligan informed Nancy Birkmeyer that she thought
she had seen a former Dartmouth-Hitchcock employee taking
pictures of the home, although the large SUV had left by the
time of their conversation.

Colligan testified at her deposition that she then began
experiencing "flooding", a symptom of PTSD that manifests as a
loud pulsing in the ears.  Colligan, therefore, could not hear
or recall what she said after she warned Nancy Birkmeyer about
the SUV and the man inside.

Colligan told or intended to tell Nancy Birkmeyer that she
did not want to be a "nosy neighbor."  Nancy Birkmeyer, however,
testified that she heard Colligan say that she was a "nosy
employee."  Doc. 36-14 at 6.  Birkmeyer also heard Colligan
state that she wanted Birkmeyer "to know that everyone knows
where you live."  Id.  Birkmeyer asked Colligan about her
meaning, and Colligan responded by "talking about" John
Birkmeyer and the restructuring issues discussed at the town
hall meetings.  Nancy Birkmeyer became uncomfortable and excused

herself from the conversation, which had lasted approximately
five minutes.

Nancy Birkmeyer thought that Colligan was threatening her
because of the restructuring plan.  She believed that Colligan
had said, essentially, "We [the Dartmouth-Hitchcock employees]
know where you live."  Nancy Birkmeyer received Colligan's
comments as thinly-veiled threats, not as bona fide concerns for
the Birkmeyers' safety from a third party.

Nancy Birkmeyer, who thought that Colligan seemed
"agitated", "crazy", and "mentally ill," reported the encounter
and Colligan's statements "verbatim" to her husband, John
Birkmeyer.  Doc. 36-14 at 8-9.  John Birkmeyer relayed the
information provided to him by his wife to John Malanowski,
Dartmouth-Hitchcock's Chief Human Resources Officer.

Meanwhile, Colligan purchased flowers for the Birkmeyers
and wrote an apology note.  Colligan returned to the Birkmeyers'
home the same morning and left the flowers and note on their
doorstep.  Nancy Birkmeyer, who saw Colligan leave the flowers
on her doorstep, described this act as "frightening".  Doc. 36-
14 at 18.  Nancy Birkmeyer reported Colligan's second appearance
to her husband.

After identifying Colligan as the person who had made the
alleged threats, John Birkmeyer contacted Blike, Colligan's
supervisor, who told Birkmeyer that there was no reason that

Colligan would be mad.  He also told Birkmeyer about Colligan's daughter's death.

John Birkmeyer, Malanowski, Blike, as well as Karen Aframe, Dartmouth-Hitchcock's Director of Employee Relations, discussed terminating Colligan's contractual relationship with Dartmouth-Hitchcock.  Based on the information provided by Nancy Birkmeyer, Malanowski and Aframe recommended that Dartmouth-Hitchcock terminate the relationship.  Blike, who had the final responsibility in deciding whether to terminate the contract, agreed with Malanowski and Aframe's recommendation.

Malanowski explained that he and Aframe recommended that Blike terminate Dartmouth-Hitchcock's contract with Colligan because she appeared "at a senior executive's house, unannounced, and threaten[ed] the wife and family of a senior leader."  Doc. 32-3 at 64.  Birkmeyer likewise understood that Dartmouth-Hitchcock was terminating Colligan because "she came to [his] house not once but twice and approached [his] family and said things that were interpreted at the time and in retrospect as threatening."  Doc. 48-10 at 29.  Although he agreed with it, Birkmeyer did not participate in the decision to terminate Colligan's contract.

After Dartmouth-Hitchcock made the decision to terminate Colligan's contract, John Birkmeyer contacted the Hanover Police Department, informing them about the incident and indicating

that Colligan had "psychological problems lately due to an unknown issue."  Doc. 42-19 at 2.  John Birkmeyer also informed the police that Colligan had delivered an apology note and he and his wife were, therefore, less concerned about any potential threat.

Aframe and Blike informed Colligan about the termination on the afternoon of September 1, 2015.  They also referred Colligan to the New Hampshire Professionals Help Program, which provides support services for mental health and psychiatric issues.

The same evening, David Luther, head of security at Dartmouth-Hitchcock, sent an e-mail to Malanowski and Aframe, discussing potential options for reducing any security threat posed by Colligan.  Luther noted that John Birkmeyer had stated that he was "not overly concerned" about Colligan "at the moment" because "she has not been threatening in any way."  Doc. 48-21 at 2.  He added that a restraining order may not be an option "due to the lack of threats . . . ."  Id.  Luther noted, however, that Birkmeyer was "happy" about Dartmouth-Hitchcock's decision to increase security patrols near his office and that "he was comfortable with just having the police department conducting extra patrols in the area."  Id.

In addition to terminating the contractual relationship, Dartmouth-Hitchcock barred Colligan from accessing its campus. Dartmouth-Hitchcock permitted Colligan to use its public medical

facility for "genuine medical emergenc[ies]" and for scheduled appointments with a medical care provider, with the caveat that Colligan contact security before arriving for a scheduled appointment.

Dartmouth-Hitchcock also informed the Geisel School of Medicine, which had appointed Colligan as an unpaid adjunct professor, about Colligan's encounter with Nancy Birkmeyer. The Geisel School of Medicine terminated Colligan's adjunct professor position.

On one occasion soon after her exclusion from Dartmouth-Hitchcock's premises, Colligan attempted to access the public medical facility for a scheduled medical appointment. As required, Colligan informed the hospital's security team before her appointment. An individual with Dartmouth-Hitchcock's security team informed Colligan, incorrectly, that she needed to check in with them when she arrived for the appointment and that she required an escort.

After Colligan filed this lawsuit, the <u>Valley News</u>, a local newspaper, published an article detailing Colligan's allegations and Dartmouth-Hitchcock's response. In the article, a Dartmouth-Hitchcock spokesperson was quoted as denying Colligan's discrimination allegations and stating that Colligan "was terminated after she appeared at a colleague's home early in the morning, acting in an inappropriate and threatening

manner that called for a police response."  Doc. 36-10 at 1.
The Valley News article further detailed the basis for
Colligan's lawsuit, including Colligan's assertion that she went
to the Birkmeyers' home to warn them about a person taking
pictures of their home.

Faced with the embarrassment arising from the publicization
of the September 1, 2015, incident, Colligan and her husband
moved to Massachusetts in August 2017.  Colligan, however,
maintains that she would like to move back to Hanover in the
future.

In this lawsuit, Colligan brings claims against Dartmouth-
Hitchcock for disability discrimination under the Rehabilitation
Act, 29 U.S.C. § 794; public accommodation discrimination under
the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182,
and N.H. Rev. Stat. Ann. ("RSA") 354-A:17; interference with an
attempt to exercise a protected right under the ADA, 42 U.S.C.
§ 12203(b) and RSA 354-A:11; intentional and negligent
infliction of emotional distress; defamation; and invasion of
privacy.  Colligan also seeks recovery of her attorneys' fees,
costs, and enhanced compensatory damages.

## Discussion

Dartmouth-Hitchcock moves for summary judgment on all of
Colligan's claims.  In response, Colligan asserts that material

facts are in dispute which precludes summary judgment.
Dartmouth-Hitchcock replied, and Colligan filed a sur-reply.

A. Wrongful Termination Under Rehabilitation Act (Count I)

Colligan alleges that Dartmouth-Hitchcock violated § 794 by terminating her contract because of her disability, PTSD. To establish a disability discrimination claim under § 794(a), the plaintiff must show that (1) she was disabled; (2) she was qualified; (3) her employer was federally funded; and (4) her employer took an adverse action against her solely because of her disability. See Rios-Jimenez v. Principi, 520 F.3d 31, 40-41 (1st Cir. 2008); Taub v. Frank, 957 F.2d 8, 11 (1st Cir. 1992); see also Lesley v. Hee Man Chie, 250 F.3d 47, 52-53 (1st Cir. 2001) (observing that an act must be taken "solely by reason of" the plaintiff's disability to be unlawful under § 794(a)).[2]

In evaluating a wrongful-termination disability discrimination claim under the Rehabilitation Act based on circumstantial evidence, the court applies the McDonnell Douglas burden-shifting framework. 411 U.S. 792, 802-05 (1973); Rios-

---

[2] Typically, case law interpreting the ADA can be used to interpret the Rehabilitation Act, which generally adopts the same standards. Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 11 n.1 (1st Cir. 2004) ("The same standards . . . apply to claims under the ADA and under the Rehabilitation Act.").

Jimenez, 520 F.3d at 40-41.  Under the burden-shifting framework, after the plaintiff establishes the elements of her prima facie case, the burden shifts to her employer to articulate a legitimate, non-discriminatory reason for her termination.  Rivera-Garcia v. Sistema Universitario Ana G. Mendez, 442 F.3d 3, 5 (1st Cir. 2006).  The plaintiff must then show that her employer's stated legitimate, non-discriminatory reason is mere pretext for discrimination.  Id.

Dartmouth-Hitchcock argues that Colligan cannot establish the causation element of her prima facie case because the individuals who made the decision to terminate Dartmouth-Hitchcock's relationship with Colligan did not know she had PTSD and because her PTSD was not the sole cause of her termination. Dartmouth-Hitchcock also argues that Colligan cannot obtain relief under the Rehabilitation Act because she was not an employee of Dartmouth-Hitchcock.

1. Knowledge of Disability

Colligan argues that she told Blike about the trauma she experienced from the death of her daughter.  Therefore, Colligan claims, Blike told Birkmeyer, Aframe, and Malanowski about her disability when they discussed her daughter's death.

To receive protection from the Rehabilitation Act and ADA, an employee need only show that she was regarded as having a

11

mental impairment.  See Mercado v. Puerto Rico, 814 F.3d 581, 588 (1st Cir. 2016) (ADA claim).  In this case, a jury could find that Blike knew Colligan had PTSD and that Malanowski and Aframe regarded Colligan as having a mental impairment.

For example, the communications between John Birkmeyer, Blike, Malanowski, and Aframe on September 1, 2015, show that each believed a psychological issue precipitated Colligan's aberrant behavior.  Aframe and Blike also recommended that Colligan seek psychiatric help when they informed her of the termination, and Birkmeyer, who communicated extensively with Dartmouth-Hitchcock's decision-makers about the termination, reported to police his belief that Colligan suffered from an unknown psychological issue.  For those reasons, a factual dispute exists as to whether Dartmouth-Hitchcock's decisionmakers knew or regarded Colligan as having a mental disability.  See Sch. Bd. of Nassau Cnty. v. Arline, 480 U.S. 273, 284 (1987) ("By amending [the Rehabilitation Act] to include those . . . who are regarded as impaired . . . Congress acknowledged that society's accumulated myths and fears about disability . . . are as handicapping as are the physical limitations that flow from actual impairment.").

2. Cause of Termination

Under the Rehabilitation Act, a plaintiff cannot establish her prima facie case for disability discrimination unless her disability was the sole reason for her termination. Taub, 957 F.2d at 11; see also Brumfield v. City of Chicago, 735 F.3d 619, 630 (7th Cir. 2013) ("Aside from the 'solely by reason of' standard of causation, which is unique to this statute and not present in the ADA, the Rehabilitation Act incorporates the standards applicable to Title I of the ADA." (citations omitted)).  The plaintiff must show that her employer would not have acted if she did not have a disability.  See, e.g., Univ. of Tx. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 347, 350-51 (2013) (describing a "but for" causal relationship as one in which the protected characteristic is the reason the employer decided to act).

Dartmouth-Hitchcock argues that Colligan has not shown that her PTSD was the sole cause or reason for her termination because the undisputed facts show that she was terminated for threatening Nancy and John Birkmeyer.  Colligan responds, asserting that Dartmouth-Hitchcock harbored a speculative fear about individuals with mental disabilities.  In support, she points to Dartmouth-Hitchcock's "knee-jerk reaction," that is, its immediate termination of her contract after her encounter with Nancy Birkmeyer.

There is no dispute that Blike hired Colligan knowing that she had or likely had a mental disability. Nor is there any dispute that Blike, having known prior to her hiring that Colligan had a mental disability, decided to terminate Colligan's contract only after Nancy Birkmeyer reported that Colligan had threatened her. Therefore, the September 1, 2015, incident was, at the least, a contributing cause of the termination. Colligan thus fails to establish that a reasonable factfinder would decide that disability discrimination was the sole reason for her termination. See Taub, 957 F.2d at 11.

Colligan attempts to evade that conclusion by arguing that Luther's September 1, 2015, e-mail shows that neither the Birkmeyers nor the police believed her actions to be threatening. Luther's e-mail discusses options for protecting the Birkmeyers, and notes that Colligan did not make threats only in the context of describing the likelihood of obtaining a restraining order against her. At the same time, the Birkmeyers requested the police to maintain patrols around their house and Dartmouth-Hitchcock increased its security around John Birkmeyer's office.[3] Considering the context of Luther's e-mail,

_____

[3] Colligan argues that the police response was aimed toward protecting the Birkmeyers from the third party she warned them about. The undisputed facts, however, contradict Colligan's argument. After the incident, John Birkmeyer asked Hanover police to patrol the area surrounding his house "in case [Colligan] is in the area." Doc. 16-2 at 2. Furthermore, a

Colligan does not raise a genuine dispute of fact about whether the Birkmeyers saw Colligan's actions on September 1, 2015, as threatening.

Colligan also suggests that Dartmouth-Hitchcock's refusal to reconsider its decision to terminate its contract with her after she explained the incident with Nancy Birkmeyer shows that Dartmouth-Hitchcock terminated the contract solely because of her PTSD. Although Dartmouth-Hitchcock's refusal to reconsider after Colligan explained that she did not intend to appear threatening to Nancy Birkmeyer may have been unfair to Colligan, the failure to reconsider does not create a material dispute as to whether Nancy Birkmeyer's allegations were, at least in part, a motivating factor. Therefore, Dartmouth-Hitchcock is entitled to summary judgment on Count I.[4]

## B. Denial of Access to Public Accommodation (Counts II and III)

Colligan claims that Dartmouth-Hitchcock discriminated against her in violation of the ADA by restricting her access to its public health facility. "No individual shall be

_____

Hanover police officer directed Colligan to avoid the Birkmeyers' residence.

[4] Dartmouth-Hitchcock also argues that Colligan is not protected under the Rehabilitation Act because she was an independent contractor rather than an employee. Because the claim is resolved on the merits, the court need not reach this issue.

discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182.[5]  Providing unequal privileges of access to a public accommodation such as a hospital because of a disability is illegal discrimination.  See id. §§ 12182(b)(1)(A), 12181(7)(F) (including professional offices of a healthcare provider and hospitals as "public accommodations").

Dartmouth-Hitchcock argues that Colligan lacks standing to pursue her public accommodation discrimination claim because she is unlikely to return to Dartmouth-Hitchcock in the future for medical care.  Dartmouth-Hitchcock also argues that Colligan has failed to bring forward evidence showing it restricted her access to the hospital based on her disability.

---

[5] New Hampshire provides a coextensive state right under RSA 354-A:17. Daigle v. Friendly Ice Cream Corp., 957 F. Supp. 8, 10 (D.N.H. 1997) ("New Hampshire state law contains a prohibition against discrimination on the basis of disability in public accommodations that is practically identical to the ADA.").  The court therefore addresses Colligan's claims in Counts 2 and 3 together.

1. Standing

The remedies for denial of equal access to a public accommodation are limited to injunctive relief, restraining orders, and similar forward-looking relief.  See 42 U.S.C. § 12188.  A plaintiff who is not likely to benefit from injunctive relief lacks standing to pursue it.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Disabled Americans For Equal Access, Inc. v. Ferries Del Caribe, Inc., 405 F.3d 60, 64 (1st Cir. 2005).

Dartmouth-Hitchcock argues that Colligan, who has moved to Massachusetts, no longer has standing to pursue injunctive relief for access to a hospital in Hanover, New Hampshire. Colligan argues that the court conducts its jurisdictional standing analysis based on the facts as they existed at the time of the complaint, when she lived in Hanover.  Steir v. Girl Scouts of the USA, 383 F.3d 7, 15 (1st Cir. 2004).  Colligan, however, must also show that her claim was not rendered moot by intervening events, such as her move to Massachusetts.  Goodwin v. C.N.J., Inc., 436 F.3d 44, 48 (1st Cir. 2006) ("[A] federal court may not grant injunctive relief when . . . intervening events have eliminated any reasonable anticipation that the aggrieved party will, in the future, be faced with a recurrence of the alleged harm."); Steir, 383 F.3d at 15-16 ("A court cannot hear an action that loses 'its character as a present,

live controversy of the kind that must exist if we are to avoid advisory opinions or abstract propositions of law.'") (quoting Hall v. Beals, 396 U.S. 45, 48 (1969)).

The First Circuit has held that, in deciding standing, district courts should consider whether a barrier to access deters a plaintiff from returning to a location or public accommodation.  See Ferries Del Caribe, 405 F.3d at 64 ("A disabled individual who is currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA and who is threatened with harm in the future because of existing or imminently threatened noncompliance with the ADA suffers actual or imminent harm sufficient to confer standing." (quoting Pickern v. Holiday Quality Foods, Inc., 293 F.3d 1133, 1138 (9th Cir. 2002)) (alterations and quotation marks omitted)).  Colligan is not likely to use Dartmouth-Hitchcock's medical services while she lives in Massachusetts.  On the other hand, she has offered evidence suggesting that Dartmouth-Hitchcock's restrictions deter her from returning and that she would return if the restrictions were lifted.

Colligan's husband, John Colligan, testified in his deposition that the allegedly unlawful restrictions played a part in their decision to move away from Hanover.  Furthermore, Colligan, who completed her medical residency in Hanover, retains connections to Hanover that support her argument that

she intends to return to Hanover.  For example, her husband's family is from the area, the Colligans maintain social connections in Hanover, and the Colligans still own their home in Hanover and, according to John Colligan's deposition testimony, have no plans to sell it.  The Colligans' daughter is also buried in Hanover.  See Norkunas v. HPT Cambridge, LLC, 969 F. Supp. 2d 184, 192 (D. Mass. 2013) (concluding that Florida-based plaintiff had standing to sue hotel in Massachusetts under ADA in part because of familial connections and spouse's burial in Massachusetts).  Dartmouth-Hitchcock offers no evidence to counter Colligan's expressed desire to return to Hanover.  Therefore, Colligan has standing to pursue an injunction permitting her to access Dartmouth-Hitchcock's medical facility without the restriction that she check in with security before arriving.[6]

## 2. Discrimination

As noted above, § 12182 and RSA 354-A:17 prohibit discrimination in access to public accommodations on the basis

---

[6] Colligan lacks standing to the extent she claims that Dartmouth-Hitchcock imposed an additional discriminatory restriction on her when security informed her she needed an escort around the building.  See doc. 48 at 24 n.12.  There is no factual dispute that the restriction was imposed by mistake, which is unlikely to reoccur.  Accordingly, forward-looking relief such as an injunction would provide Colligan no benefit.

of a disability.  To recover on a claim of unequal access, a plaintiff must show that she had a disability and that the defendant denied equal access to its public accommodation on the basis of her disability.  42 U.S.C § 12182(b).  Dartmouth-Hitchcock argues that Colligan's public accommodation discrimination claim fails because it did not restrict her access to its hospital on the basis of her mental disability. Instead, Dartmouth-Hitchcock states that Colligan's actions on September 1, 2015, are the reason it limited her access to Dartmouth-Hitchcock's medical services.  Colligan responds that the restrictions on her access to the facility arose from Dartmouth-Hitchcock's stereotypes or beliefs about people with mental disabilities.

Dartmouth-Hitchcock imposed the restrictions immediately after the September 1, 2015, incident.  Colligan has shown that Dartmouth-Hitchcock refused to hear or consider evidence from her that suggested she was not an on-going threat.  Dartmouth-Hitchcock's immediate reaction, combined with its refusal to consider evidence opposing its initial conclusion, is evidence from which a reasonable jury could find that Dartmouth-Hitchcock's perception of Colligan's mental disability, rather than any actual threat, motivated or partially motivated Dartmouth-Hitchcock to impose and maintain its restriction.  See Quiles-Quiles v. Henderson, 439 F.3d 1, 6 (1st Cir. 2006) ("The

belief that the mentally ill are disproportionately dangerous is precisely the type of discriminatory myth that the Rehabilitation Act and ADA were intended to confront."); Schultz v. Young Men's Christian Ass'n of U.S., 139 F.3d 286, 289 (1st Cir. 1998) ("The disability statutes were meant to counter mistaken assumptions, no matter how dramatic or widespread.").

At bottom, Dartmouth-Hitchcock's argument in favor of summary judgment on Colligan's public accommodation discrimination claim is premised on an implicit assertion that Colligan posed an on-going security threat because of her actions and not because of mental illness. To be successful, however, Dartmouth-Hitchcock must show that the direct threat defense applies here. Under the direct threat defense, a provider of a public accommodation may limit or modify access to a disabled individual if the provider shows that she poses a "direct threat to the health or safety of others." See 42 U.S.C. § 12182(b)(3); Dudley v. Hannaford Bros. Co., 190 F. Supp. 2d 69, 75-76 (D. Me. 2002) (observing that an argument that the plaintiff "waived" a right to a reasonable modification of store policy for his disability because he acted "unruly" was a "variation on the principle that an entity is absolved of the duty to accommodate disabilities . . . if doing so would pose a 'direct threat' to the general public."), aff'd, 333 F.3d 299 (1st Cir. 2003). Dartmouth-Hitchcock, however, does not assert

the "direct threat" defense. Because Dartmouth-Hitchcock does not argue or present evidence that Colligan was a direct threat, the court need not address whether Dartmouth-Hitchcock satisfies the defense's elements. As a result, a factual dispute remains as to whether Dartmouth-Hitchcock discriminated against Colligan because of her disability.

C. <u>Interference Under the ADA and RSA Chapter 354-A (Counts IV and V)</u>

The ADA prohibits a defendant from coercing, intimidating, threatening, or interfering with any individual's exercise or enjoyment of a right protected by the ADA. 42 U.S.C. § 12203(b). New Hampshire's version of the statute provides virtually identical language, and the parties appear to agree that the court should treat the statutes in the same manner. <u>See</u> RSA 354-A:11.[7]

Generally, courts treat interference claims under § 12203(b) like retaliation claims under § 12203(a). <u>See, e.g.,</u> <u>Goldblatt v. Geiger</u>, 867 F. Supp. 2d 201 (D.N.H. 2012); <u>Vazquez v. Mun. of Juncos</u>, 756 F. Supp. 2d 154, 165 (D.P.R. 2010). A

_____

[7] Dartmouth-Hitchcock does argue that RSA 354-A:11 protects a plaintiff from interference only while enjoying a right protected under the "Fair Housing" subdivision of Chapter 354-A, which is not relevant to this suit. Because the claim fails irrespective of whether RSA 354-A:11 applies beyond the "Fair Housing" subdivision, the court need not address the issue and will treat the statutes as coextensive.

claim of interference, therefore, requires a plaintiff to establish that (1) she engaged in, or aided others in engaging in, conduct protected by the ADA; (2) she suffered an adverse action prohibited by § 12203(b), such as coercion, intimidation, or interference; and (3) there was a causal connection between her conduct and the adverse action.  See Goldblatt, 867 F. Supp. 2d at 211 (citing Freadman v. Metro Prop. & Cas. Ins. Co., 484 F.3d 91, 106 (1st Cir. 2007)); see also Frakes v. Peoria Sch. Dist. No. 150, 872 F.3d 545, 550-51 (7th Cir. 2017).  The plaintiff must show that when interference occurred she "was exercising or enjoying a right protected by the ADA, or that the coercion was on account of [her] having engaged in such protected conduct."  Feeley v. New Hampshire, 2010 WL 4774274, at *5 (D.N.H. Aug. 20, 2010).

Dartmouth-Hitchcock argues that Colligan's interference claims must fail because any protected activity she undertook occurred after any alleged interference.  Colligan responds that Dartmouth-Hitchcock interfered with her attempt to use Dartmouth-Hitchcock's medical facilities when it limited her access to them.

All the restrictions on Colligan's access to Dartmouth-Hitchcock were imposed immediately after her encounter with Nancy Birkmeyer on September 1, 2015, which was not a protected activity.  Therefore, Colligan's claim that Dartmouth-Hitchcock

23

imposed additional restrictions when she attempted to use Dartmouth-Hitchcock's medical facilities fails. Although a security officer mistakenly thought that Colligan required an escort for a scheduled appointment, Dartmouth-Hitchcock acknowledged and corrected that mistake. Colligan offers no contradicting evidence from which a jury could conclude that the security officer imposed the restriction to retaliate against Colligan for attempting to access the facility.

Colligan also argues that Dartmouth-Hitchcock "fully" barred her from its facilities after she filed a complaint with the New Hampshire Commission for Human Rights, and, therefore, interfered with her rights under the ADA and Chapter 354-A. Doc. 48 at 28. Colligan, however, identifies no evidence that the restrictions increased after she filed that complaint, and, as noted above, Dartmouth-Hitchcock imposed all the restrictions on Colligan's access to the facility immediately following the September 1, 2015, incident.[8]

Dartmouth-Hitchcock has shown based on undisputed facts that it did not interfere with Colligan's exercise of protected

---

[8] Colligan appears to contend that Dartmouth-Hitchcock increased the restrictions by prohibiting her from attending a support group meeting at its "Aging Resource Center" after she filed her complaint. Dartmouth-Hitchcock, however, asserted that the "Aging Resource Center" was part of its campus rather than its public medical facility, and Colligan identifies no evidence that Dartmouth-Hitchcock allowed her to access the "Aging Resource Center" before she filed the complaint.

rights.  Therefore, Dartmouth-Hitchcock is entitled to summary
judgment on Counts IV and V.

D. Intentional Infliction of Emotional Distress (Count VI)

    An intentional infliction of emotional distress claim
requires a plaintiff to show that the defendant, through an
"extreme and outrageous" act, intentionally or recklessly caused
the plaintiff severe emotional distress.  Tessier v.
Rockefeller, 162 N.H. 324, 341 (2011) (quoting Morancy v.
Morancy, 134 N.H. 493, 496 (1991)).  The bar to establish
intentional infliction of emotional distress in New Hampshire
"is very high."  Moss v. Camp Pemigewassett, Inc., 312 F.3d 503,
511 (1st Cir. 2002).  The outrageous act must "go beyond all
possible bounds of decency" and be "regarded as atrocious, and
utterly intolerable in a civilized community."  Mikell v. Sch.
Admin. Unit No. 33, 158 N.H. 723, 729 (2009).

    Dartmouth-Hitchcock argues that Colligan fails to establish
conduct sufficiently reprehensible as to support an intentional
infliction of emotional distress claim.  Colligan responds,
asserting that personal attacks and stereotyping of a plaintiff
can support an intentional infliction of emotional distress
claim.

    In support, Colligan points to Naeem v. McKesson Drug Co.,
444 F.3d 593 (7th Cir. 2006), which holds that "extreme and

outrageous" conduct can include particularly severe workplace disagreements or false accusations involving the intentional exacerbation of a medical condition.  Colligan identifies no evidence from which a reasonable juror could find that Dartmouth-Hitchcock intentionally exacerbated Colligan's mental impairment.  Although false accusations might give rise to an emotional distress claim in the appropriate circumstances, the accusations here, even if false, were not so egregious or distortive of reality that they can be characterized as outrageous.  See Mikell, 158 N.H. at 729 (affirming dismissal of intentional infliction of emotional distress claim by student who was falsely accused of misconduct and expelled from school).

Colligan also asserts that Dartmouth-Hitchcock acted illegally out of fear about what she might do in the future because of her mental disability.  The New Hampshire Supreme Court has held that even if a discharge is "illegal and reprehensible, a great deal more is required to approach outrageous conduct." Konefal v. Hollis/Brookline Coop. Sch. Dist., 143 N.H. 256, 260 (1998) (quoting Lococo v. Barger, 958 F. Supp. 290, 298 (E.D. Ky. 1997)); see also Davis v. United Postal Serv., Inc., 2003 WL 21146167, at *3 (D.N.H. May 16, 2003) ("[D]iscrimination on the basis of disability, verbal harassment and retaliation are not, without more, sufficient to support an intentional infliction of emotional distress claim

. . . .").  For example, in <u>Miller v. CBC Companies, Inc.</u>, the
court found that a plaintiff who faced "a series of disturbing
verbal commentaries and personal attacks" preceding her
discriminatory termination "just barely satisfied" her burden to
allege outrageous conduct.  908 F. Supp. 1054, 1067-68 (D.N.H.
1995).  Unlike the plaintiff in <u>Miller</u>, Colligan does not show
misconduct by Dartmouth-Hitchcock beyond the allegedly
discriminatory termination.  Therefore, Dartmouth-Hitchcock is
entitled to summary judgment on Count VI.

E. <u>Negligent Infliction of Emotional Distress (Count VII)</u>

To establish negligent infliction of emotional distress,
the plaintiff must show that the defendant negligently caused a
foreseeable and serious mental and emotional harm accompanied
with objective physical symptoms.  Tessier, 162 N.H. at 342.
Dartmouth-Hitchcock argues that it cannot be liable for
negligent infliction of emotional distress because its acts were
intentional.

That argument lacks merit.  Dartmouth-Hitchcock's intent to
terminate its contract with Colligan does not insulate it from
liability for the unintended consequences caused by the way it
terminated the contract.  An intended act can cause unintended
but foreseeable injuries.  It is for those acts that a defendant
may be found negligent.  <u>See, e.g., id.</u> (observing that facts

underlying claim for intentional misrepresentation also supported claim for negligent infliction of emotional distress).

Dartmouth-Hitchcock states, in a single sentence, that it was not foreseeable that Colligan would suffer severe emotional distress because of the termination of the contract. Dartmouth-Hitchcock, however, did not develop this argument, which involves complex and undecided issues of New Hampshire state law. The court will not develop the argument on Dartmouth-Hitchcock's behalf. Doherty v. Merck & Co., Inc., 892 F.3d 493, 500 (1st Cir. 2018) ("It is a familiar refrain in this circuit that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)); see also Coons v. Indus. Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010).

Dartmouth-Hitchcock also argues that the mere breach of a contract or termination of an employee alone cannot support a cause of action for negligent infliction of emotional distress. Colligan responds that a breach of contract is not the basis for her negligent infliction of emotional distress claim.

As Dartmouth-Hitchcock observes, New Hampshire prohibits recoveries in tort for mere breaches of contract. Young v. Abalene Pest Control Servs., Inc., 122 N.H. 287, 289-90 (1982). Therefore, Colligan cannot recover for emotional distress based

on Dartmouth-Hitchcock's breach of its contractual obligations alone.  See id. ("Whether an action is 'on a contract or in tort is not controlled by the form of the action but by its substance.'") (quoting Dunn & Sons, Inc. v. Paragon Homes of New Eng., Inc., 110 N.H. 215, 217 (1970)).  Colligan, however, does not premise her emotional distress claim merely on the breach.

Instead, she asserts that the manner in which Dartmouth-Hitchcock breached the contract—by way of discrimination—caused her emotional distress.  In other words, Colligan's claim focuses on the emotional distress caused by Dartmouth-Hitchcock's alleged discrimination, not on the emotional distress caused by the loss of her employment.  See, e.g., Vandegrift v. American Brands Corp., 572 F. Supp. 496, 499 (D.N.H. 1983) ("If . . . the facts constituting the breach of the contract also constitute a breach of a duty owed by the defendant to the plaintiff independent of the contract, a separate claim for tort will lie."); see also Parsons v. United Technologies Corp., 243 Conn. 66 (1997) ("[N]egligent infliction of emotional distress in the employment context arises only where it is 'based upon unreasonable conduct of the defendant in the termination process.'").  Therefore, Dartmouth-Hitchcock has not shown that it is entitled to summary judgment on Count VII.

F. Defamation (Counts VIII and IX)

      To establish a defamation claim, a plaintiff must show
"that the defendant failed to exercise reasonable care in
publishing a false and defamatory statement of fact about [her]
to a third party . . . ."  Sanguedolce v. Wolfe, 164 N.H. 644,
646 (2013) (internal quotation marks omitted).  Dartmouth-
Hitchcock argues that Colligan's defamation claims, which are
premised on Dartmouth-Hitchcock's communications to the Geisel
School of Medicine and the Valley News about the September 1,
2015, incident, fail because the statements were opinions and
were substantially true.  Dartmouth-Hitchcock also asserts that
its communication to the Geisel School of Medicine is subject to
a conditional privilege for the good faith sharing of
information in a common interest.

      Colligan responds that Dartmouth-Hitchcock's statements
that she acted in a "threatening" manner were not published in
good faith because Luther's e-mail indicates that Nancy and John
Birkmeyer did not feel threatened.  Likewise, Colligan contends
that the incident did not call for a "police response" as
Dartmouth-Hitchcock reported.  Instead, she argues, her warning
that a third party was watching the Birkmeyers' home required
the police response.  Colligan adds that, at most, the only
"police response" related to her encounter with Nancy Birkmeyer
was for "informational purposes."

1.  <u>Publication to the Valley News</u>

An opinion is not actionable as defamation if it was
published alongside a fully disclosed factual basis.  <u>Nash v.
Keene Pub. Corp.,</u> 127 N.H. 214, 219 (1985); <u>Pease v. Telegraph
Pub. Co., Inc.,</u> 121 N.H. 62, 64-65 (1981).  The court examines
the totality of the circumstances to determine whether an
average reader could view a statement as one of opinion or fact.
See <u>Nash</u>, 127 N.H. at 219; <u>Riblet Tramway Co., Inc. v. Ericksen
Assocs., Inc.,</u> 665 F. Supp. 81, 84-85 (D.N.H. 1987).

Dartmouth-Hitchcock's statement to the <u>Valley News</u> was made
as part of its denial of liability, a context in which an
average reader would expect to receive Dartmouth-Hitchcock's
opinion.  Furthermore, the use of terms "inappropriate" and
"threatening" suggests a characterization of Colligan's acts.
For example, in <u>Riblet</u>, the court examined whether the term
"risk" suggested fact or opinion, concluding that "'[r]isk' is a
word that suggests possibility, chance, or an element of
uncertainty in an undertaking.  It implies that an opinion or
assessment of possibilities forms it basis." 665 F. Supp. at
84-85.  Similarly, here, the phrase "acting in an inappropriate
and threatening manner" implies that Dartmouth-Hitchcock's
assessment of the facts led it to believe that she acted in that
way.  A disclosure of the relevant facts that formed the basis

of this opinion accompanied the Valley News article, as the
article recites the details of the September 1, 2015, incident.
Dartmouth-Hitchcock's publication to Valley News, therefore, is
not actionable.[9]  See Nash, 127 N.H. at 219.

    2. Publication to the Geisel School of Medicine

    As to the communication to the Geisel School of Medicine,
Dartmouth-Hitchcock argues that it is protected by the common-
interest privilege.  A statement is subject to a conditional
privilege "if it was 'published on a lawful occasion, in good
faith, for a justifiable purpose, and with a belief, founded on
reasonable grounds of its truth, provided that the statement
[was] not made with actual malice.'"  Collins v. Univ. of New
Hampshire, 664 F.3d 8, 19 (1st Cir. 2011) (quoting Simpkins v.
Snow, 139 N.H. 735, 776-77 (1995)).  Colligan does not dispute
that Dartmouth-Hitchcock had a common interest with the Geisel
School of Medicine about Colligan's employment status or that
Dartmouth-Hitchcock reasonably believed that the Geisel School
of Medicine was entitled to know that Dartmouth-Hitchcock had
terminated its employment relationship with Colligan because of

_____

    [9] To the extent Colligan's claim is premised on Dartmouth-
Hitchcock's fact-based statement that the incident called for a
police response, the statement is not actionable as it was
substantially true.  As noted in Section A.2 of this opinion,
after the incident, John Birkmeyer asked the police to patrol
the area surrounding his house in case Colligan returned.  Supra
p. 15 & n.3.  The police provided the requested patrol.

the alleged threats.  See Restatement (Second) of Torts § 596

("An occasion makes a publication conditionally privileged if

the circumstances lead any one of several persons having a

common interest in a particular subject matter correctly or

reasonably to believe that there is information that another

sharing the common interest is entitled to know."); Chopmist

Hill Fire Dep't v. Town of Scituate, 780 F. Supp. 2d 179, 194

(D.R.I. 2011) ("[A] reciprocity of duty must exist between the

publisher and the recipient—such that the recipient has an

interest in receiving the information and the publisher has an

interest in communicating it.").

Instead, Colligan challenges Dartmouth-Hitchcock's good

faith in making the statement.  Colligan fails, however, to

identify evidence showing that the publication was made without

good faith and therefore exceeded the scope of the privilege.

See Caouette v. OfficeMax, Inc., 352 F. Supp. 2d 134, 144

(D.N.H. 2005) (holding that summary judgment is appropriate on a

defamation claim where "the record discloses no evidence" that

the publisher exceeded scope of qualified privilege).  As with

her discriminatory termination claim, Colligan asserts that

Luther's September 1, 2015, e-mail shows that John Birkmeyer did

not feel threatened by her actions.  That argument fails for the

same reasons as discussed above in Section A.2 of this opinion.

Dartmouth-Hitchcock is entitled to summary judgment on Counts VIII and IX.

## G. False Light (Count X)

Colligan premises her false light claim on the same facts as her defamation claims. New Hampshire has not recognized false light as a cause of action. Thomas v. Telegraph Pub. Co., 151 N.H. 435, 440 (2004). Courts have noted that, if recognized in New Hampshire, false light would likely follow the Restatement's formulation. See, e.g., Forcier v. Creditors Specialty Serv., 2014 WL 6473043, at *28-31 (D.N.H. Oct. 24, 2014). Under the Restatement, the defendant must not give "publicity to a matter concerning another that places the other before the public in a false light" if he "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." Wentworth-Douglass Hosp. v. Young & Novis Professional Ass'n, 2011 WL 446739, at *6 (D.N.H. 2011) (quoting Restatement (Second) of Torts § 652E).

Dartmouth-Hitchcock argues that Colligan's false light claim must fail because its statements to the Valley News and the Geisel School of Medicine were substantially true and were not publicized by Dartmouth-Hitchcock, but rather by Colligan

herself.  Colligan responds, asserting again that Luther's e-mail undercuts the truth of Dartmouth-Hitchcock's statements.

"Under any circumstances that would give rise to a conditional privilege, there is likewise a conditional privilege for the invasion of privacy."  Restatement (Second) of Torts § 652G cmt. a; see also Rosa and Raymond Parks Institute for Self Development v. Target Corp., 812 F.3d 824, 831 n.15 (11th Cir. 2016); Sullivan v. Conway, 157 F.3d 1092, 1098-99 (7th Cir. 1998) ("[T]he same privileges are applicable to the false-light tort as to the defamation tort.  Otherwise privilege could be defeated by relabeling.") (citations omitted).  Therefore, the conditional privilege discussed above as to Dartmouth-Hitchcock's communication to the Geisel School of Medicine must apply to Colligan's false light claim on that statement as well.

Furthermore, Dartmouth-Hitchcock cannot be found liable for its communication to the Valley News that Colligan alleges publicly placed her in a false light because it was made after Colligan herself publicized this matter.  See Restatement (Second) of Torts § 652E; Godby v. Montgomery Cnty. Bd. of Educ., 996 F. Supp. 1390, 1417 (M.D. Ala. 1998) (applying Restatement formulation of false light and observing, in dicta, that claim could fail because "Plaintiffs are asking this court to punish someone for offering their version of an event, when

it was the Plaintiffs who made the event public in the first place.").[10]

Alternatively, provided it did not make the statements in bad faith or with reckless disregard to their falsity, Dartmouth-Hitchcock had a right to publicly respond to Colligan's allegations.  Restatement (Second) of Torts § 594 cmt. K ("[T]he defendant may publish in an appropriate manner anything that he reasonably believes to be necessary to defend his own reputation against the defamation of another . . . ."); see also Lluberes v. Uncommon Prods. LLC, 663 F.3d 6, 18-19 & n.11 (1st Cir. 2011) (discussing conditional "privilege of reply").  Colligan again points to Luther's e-mail as establishing that Dartmouth-Hitchcock knew its characterization of her actions as threatening was false, but, as discussed above, the e-mail does not reasonably support that conclusion. Therefore, Dartmouth-Hitchcock is entitled to summary judgment on Count X.

---

[10] Colligan also attempts to expand her false light claim by stating that it is "not limited to" the two communications discussed above.  She identifies in her argument only one other communication, an alleged publication made by Dartmouth-Hitchcock "to its list-serve" on November 28, 2016.  Doc. 48 at 34.  Even setting aside Colligan's failure to provide or reference any evidence regarding this communication or its content, it appears to have occurred after Colligan publicized the issue by filing this lawsuit.

<u>Conclusion</u>

The court grants in part and denies in part defendants'
motion for summary judgment.  The court grants the motion as to
Counts I-II, V-VI, and VIII-X.  The court denies the motion as
to Counts III, IV, and VII.

Now that Dartmouth's motion for summary judgment has been
resolved, the parties know what claims remain in the case for
trial.  Trial is currently scheduled for the period beginning on
March 19, 2019.  Before the parties and the court spend the
considerable time and resources necessary to prepare for trial,
the parties are expected to use their best efforts to resolve
all or part of the remaining claims.  The court also calls the
attention of the parties to its order of January 25, 2018,
concerning its expectation that the parties will mediate this
case before trial will proceed.

SO ORDERED.


                                    Joseph A. DiClerico, Jr.
                                    United States District Judge


December 17, 2018

cc:   William E. Christie, Esq.
      Natalie J. Laflamme, Esq.
      Timothy John McLaughlin, Esq.
      William D. Pandolph, Esq.
      Christopher James Pyles, Esq.